# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ADA REAL ESTATE JOINT VENTURE, LTD., an Ohio limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>STAPLES THE OFFICE SUPERSTORE, EAST, INC., a Delaware corporation; and STAPLES INC., a Delaware corporation,<br><br>Defendants. | Case No. 6:24-cv-437-JAR |

## OPINION AND ORDER

This is a breach of contract case arising out of a commercial lease agreement (the "Lease") covering a Staples retail store located in Ada, Oklahoma (the "Premises"). Before the court is the motion for partial summary judgment filed on behalf of plaintiff Ada Real Estate Joint Venture, Ltd. ("Landlord") [Doc. 35] and the joint motion for summary judgment filed on behalf of defendants Staples the Office Superstore East, Inc. ("Tenant") and Staples Inc. [Doc. 36].[1]

Landlord moves for a summary judgment determination in favor of its remaining breach of contract claim. Defendants timely responded in opposition [Doc. 38], and Landlord elected not to file a reply brief. Conversely, defendants move for summary judgment against Landlord's claims for (1) breach of contract based on Tenant's alleged failure to file an insurance claim or otherwise pay for replacement of the roof on the leased Premises, and (2) waste based on Tenant's alleged failure to

---

[1] For clarity and consistency herein, when the court cites to the record, it uses the pagination and document numbers provided by CM/ECF.

work towards replacing the roof. Landlord timely responded in opposition [Doc. 40] and defendants filed a joint reply [Doc. 41].[2]

## I.  UNDISPUTED MATERIAL FACTS [3]

Landlord and Tenant entered into the Lease at issue on or about August 13, 1998. [Doc. 36-1]. This exact Lease has been used for multiple transactions between Landlord and defendants at other Staples retail locations in Oklahoma and Ohio. [Doc. 35 at 1, ¶ 2; Doc. 38 at 2, ¶ 2]. The parties subsequently executed four amendments to the Lease which, *inter alia*, extended the tenancy period and altered certain provisions unrelated to the issues herein. Each amendment confirmed, adopted, and ratified the terms of the Lease, except as expressly modified. [Doc. 36-8; Doc. 36-9; Doc. 36-10; Doc. 36-11].

### A.  INSURANCE OBLIGATIONS UNDER THE LEASE

As for the parties' respective insurance obligations and associated liability, the Lease sets forth the following provisions:

> 7.2.2. *Property Insurance.* After delivery of possession and during the Term, Tenant shall, at its sole cost and expense, maintain "all-risk" property insurance covering the Premises against loss or damage resulting from fire and other insurable casualties (including rent insurance as set forth in Section 7.2.3. hereof). Such insurance shall be on a 100% replacement cost basis.
>
> 7.3.1. *Provisions of Policies.* Landlord and Tenant shall maintain, unless unavailable in the State of Oklahoma at commercially reasonable rates, insurance policies (a) on an occurrence basis [and] (b) providing primary

---

[2] The court exercises its discretion to take judicial notice *sua sponte* of the record developed during briefing on the parties' pending summary judgment motions. *See* [Doc. 35; Doc. 36; Doc. 38; Doc. 40; Doc. 41]. *See* Van Woudenberg ex rel. Foor v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by* McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) (noting a district court may take judicial notice "of its own files and records, as well as facts which are a matter of public record."); *see also* Fed. R. Evid. 201.

[3] Unless otherwise noted, the following facts are undisputed for summary judgment purposes.

> coverage and not calling upon any other insurance procured by other parties for defense, payment or contribution … Prior to delivery of possession of the Premises, and at least 15 days prior to the expiration of any existing policy, <u>Landlord and Tenant will provide the other with certificates of required insurance</u>. … <u>In the event of any casualty, all property insurance proceeds shall be paid to Landlord and used for restoration as required by Article X hereof</u>.
>
> 7.3.2. *Release; Waiver of Subrogation*. Landlord and Tenant each hereby release each other from liability for damage to the property of the other to the extent of insurance maintained or required to be maintained hereunder (<u>including any deductible</u> or self-insured portions) …

[Doc. 36-1 at 16-17 (emphasis added)]. It is undisputed that Tenant annually issued to Landlord a certificate evidencing a policy of all-risk commercial property insurance (the "Policy") maintained by Tenant from April 1, 2021 through April 1, 2025. [Doc. 36 at 9, ¶ 5; Doc. 40 at 2, ¶ 5]. These certificates established the Policy's deductible was $250,000 per casualty event. [Doc. 36-4 at 5; Doc. 36-5 at 5; Doc. 36-6 at 5; Doc. 36-7 at 1]. The parties do not dispute that the Lease imposes no cap on the Policy's deductible, does not obligate Tenant to reimburse Landlord for any portion of the deductible, and contains no provision requiring Tenant to contribute the deductible amount toward roof replacement costs. The parties further agree that no amendments to the Lease addressed the Policy's deductible. [Doc. 36 at 9-10, ¶¶ 4, 8; Doc. 40 at 2-3, ¶ 4, 8].

### B.  REPAIR AND RESTORATION OBLIGATIONS UNDER THE LEASE

On March 14, 2024, a hailstorm struck the Premises and caused significant roof damage. [Doc. 36 at 11, ¶ 11; Doc. 40 at 3, ¶ 11]. It is undisputed that the hailstorm constituted a casualty event under the Lease. Tenant claims (and Landlord disputes) that, prior to the hailstorm, multiple roof leaks had already created

substantial water infiltration issues within the interior of the Premises. *See* [Doc. 36-12 at ¶ 8; Doc. 36-13 (2023.11.03 ServiceMaster Invoice for "Water Mitigation Services")]. In any event, Tenant immediately notified Landlord of the damage caused by the hailstorm. [Doc. 36-22 ("[T]he [hailstorm] that went through the area ripped through the recent roof repairs causing water infiltration" that was "minimal but the hail got into the store. … Please have your roofers on site 03/15 to make temporary repairs to ensure this does NOT happen again. Someone could have been injured.")].

After inspecting the roof damage on March 22, Landlord's contractor acknowledged that it "should look to expedite this process as fast as possible … so we can get a new roof installed asap." [Doc. 36-23]. Landlord issued a letter to Tenant the following week, stating in pertinent part:

> It is our position, based on the Lease Agreement, Section 7.2.2, that <u>obligation and cost of repair falls to Staples Inc</u>. The lease stipulates that Tenant shall maintain "all-risk" property insurance covering the Premises against loss or damage resulting from fire and other insurable casualties.
>
> Therefore, <u>it is the obligation of Staples Inc. to begin the process of repair and replacement immediately</u>. Any delay in facilitating these repairs and replacement that results in additional damage to the Premises will be the liability of Staples Inc.

[Doc. 36-24 (emphasis added)]. Tenant sent a reply letter on April 10, stating its position that Sections 8.2 and 10.1 of the Lease require Landlord to repair the roof after a casualty loss at Landlord's sole expense. [Doc. 36-25]. These Lease provisions provide in pertinent part:

> 8.2. *Landlord's Obligations*. <u>Landlord, *at Landlord's sole expense* … agrees to: (a) maintain the exterior and structural portions of the Building in good order and repair, including repairing and replacing</u> … structural supports, <u>roofs (including maintaining the roof in a</u>

4

<u>watertight condition), roof structures, walls, and canopies</u>; [and] (b) make all alterations, repairs and replacements, interior and exterior, when necessary as a result of Landlord's failure to promptly discharge its obligations under this Lease.

10.1 *Restoration.* <u>Upon any damage due to fire or other casualty, *Landlord shall at its expense* restore the Premises</u> (including tenant improvements for which coverage is maintained pursuant to Section 7.2. but excluding Tenant's trade fixtures, inventory and other personal property) <u>to substantially their condition prior to such casualty</u>. Landlord shall undertake such restoration with due diligence and in any event shall commence restoration within 60 days after receipt of insurance proceeds for such casualty and complete such restoration within 180 days after receipt of insurance proceeds for such casualty. … Notwithstanding the cause for any delay, the restoration shall be completed within 270 days after the fire or casualty as such date may be extended to the extent Landlord has not received insurance proceeds for restoration *solely* <u>due to *Tenant's bad faith* in obtaining the same</u>.

[Doc. 36-1 at 18-19, 21 (emphasis added)].

On May 8, 2024, Tenant issued a Notice of Landlord Default pursuant to Sections 8.2 and 13.2 (*Quiet Enjoyment*) of the Lease, asserting that the roof membrane was "beyond its useful life" and in need of "immediate replacement." [Doc. 36-26 at 1]. Tenant further reported experiencing "substantial water infiltration on a very frequent (almost daily) basis," which necessitated ongoing "interior water extraction and drying measures" and prevented Tenant from operating its business safely for employees and customers. [Doc. 36-26 at 1-2]. Tenant also expressly reserved its right under Section 12.4 of the Lease to undertake emergency self-help measures, including the performance of "necessary work on behalf of and at Landlord's expense," with the additional right to offset unreimbursed charges against future rent and additional payments if not reimbursed within 30 days. [Doc. 36-25 at 2].

5

On June 11, 2024, Tenant issued a second Notice of Landlord Default pursuant to Sections 8.2 and 13.2 of the Lease, asserting it had obtained a roof inspection report on April 13 with findings of failing seams throughout the roof system, deterioration of the roof membrane to a point of not holding repairs, and that the roof was past its serviceability by several years. [Doc. 36-29 (*citing* Doc. 36-27 at 2-4, 6]. The roof evaluation report obtained by Landlord on April 16 revealed that the Premises roof was 25 years old, exhibited 14 internal leaks, and suffered from severe draining defects causing water to pond. This report also noted extensive patchwork that would hinder future repairs, multiple impact cracks likely caused by hail, and significant erosion of the membrane's waterproofing—all of which were assessed with "High" to "Very High" severity ratings. [Doc. 36-28 at 6, 17-18, 20, 23].

Between July 16 and 29, Tenant repeatedly contacted Landlord to confirm whether roof replacement would begin on the projected start date of August 8. [Doc. 36-32 at 1-2]. On July 29, Landlord responded that it was "finalizing the details" and "will be in touch." [*Id.* at 1]. Two days later, on July 31, Tenant informed Landlord that a "VERY large crack in the concrete near the roof" had developed which was so significant that employees could "see daylight through the side of the building." [Doc. 36-30 at 1-2]. In response, Tenant evacuated the Premises and requested that Landlord immediately send a team to assess structural damage. [*Id.* at 2]. Landlord replied the following day, attributing the issue to "the expansion joint" based on its contractor's inspection and stating that it would proceed with repairs. [Doc. 36-30]. On August 8, Landlord informed Tenant that the anticipated start date was pushed

from August 8 to August 26 because "[t]here was a small delay in material." [Doc. 36-33]. However, on August 12, Landlord's contractor advised Tenant's store manager that he was "just ordering the roof replacement materials today" and that delivery would take approximately three weeks [Doc. 36-34].

On August 13, Tenant served a third Notice of Landlord Default pursuant to Sections 8.2 and 13.2 of the Lease, citing Landlord's sustained failure to replace the roof despite ongoing reports that "Tenant continues to experience extensive roof leaks" and "substantial water infiltration on a very frequent basis." [Doc. 36-31]. These conditions drove Tenant to incur approximately $14,133.02 in out-of-pocket remediation expenses and water-related repairs from March 25 to October 10, 2024.[4] Comparatively, from March 19 to August 1, 2024, Landlord initiated repairs on six separate occasions to address water leaks attributed to the hailstorm and incurred approximately $15,710.96 in restoration expenses. [Doc. 35-3; Doc. 35-5; Doc. 35-6; Doc. 35-7].

Landlord engaged a contractor to replace the Premises roof in early-September, received a $116,250 estimate, and initiated roof replacement on September 3, 2024. [Doc. 35-8; Doc. 36-35]. On November 18, Tenant served a fourth and final Notice of Landlord Default pursuant to Section 8.2 of the Lease, asserting that it continued to experience extensive roof leaks within the Premises during any

---

[4] *See* [Doc. 36-14 (2024.03.25 ServiceMaster ("SRM") Invoice); Doc. 36-15 (2024.04.23 SRM Invoice); Doc. 36-16 (2024.04.23 Emergency Maintenance Solutions ("EMS") Invoice); Doc. 36-17 (2024.05.30 SRM Invoice); Doc. 36-18 (2024.06.19 SRM Invoice); Doc. 36-19 (2024.06.21 23rd Group Facility Services Invoice); Doc. 36-20 (2024.06.24 EMS Invoice); Doc. 36-21 (2024.10.10 SRM Invoice)].

7

significant rain event despite completion of roof replacement in early October 2024. [Doc. 36-36 at 1].

## II. PROCEDURAL HISTORY

Landlord commenced this action on August 20, 2024 in the District Court of Pontotoc County, Oklahoma, by asserting the following claims against defendants: breach of contract based on defendants' failure to file an insurance claim for the replacement of the leased Premises roof (Count I); breach of contract based on defendants' failure to maintain the leased premises in good order (Count II); a "waste" claim based on defendants' failure to work towards replacing the premises roof (Count III); and a waste claim based on defendants' failure to maintain the parking and driving areas in a satisfactory state (Count IV). Landlord seeks relief on these claims in the form of special and pecuniary damages exceeding $171,034.91. [Doc. 2-4].[5]

Defendants responsively asserted the following compulsory counterclaims against Landlord in state court: (1) breach of contract to recoup out-of-pocket costs incurred to repair damage to the Premises caused by the hailstorm; (2) breach of contract based on Landlord's failure to repair or replace the roof of the Premises in a good and workmanlike manner; (3) breach of the covenant of quiet enjoyment; (4) declaratory judgment that Landlord is obligated under the Lease to restore the Premises at Landlord's sole expense. [Doc. 2-11]. On November 8, 2024, defendants filed a joint notice of removal to this court based on diversity of citizenship and the amount in controversy. [Doc. 2 at 4]. By virtue of the express consent of the parties

---

[5] At the in-person motion hearing on June 17, 2025, the parties informed this court that Counts III and IV of Landlord's petition are subject to a finalized settlement agreement.

8

[Doc. 12], and in accordance with Fed. R. Civ. P. 73(a) and 28 U.S.C. § 636(c)(1), the undersigned United States Magistrate Judge exercises complete jurisdiction over this action through and including trial and the entry of a final judgment.

### III.  SUMMARY JUDGMENT STANDARD

The court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. The court construes the record in the light most favorable to the nonmoving party. Id. at 240-50; Hall v. Allstate Fire & Cas. Ins. Co., 20 F.4th 1319, 1323 (10th Cir. 2021).

### IV.  ANALYSIS

In cases brought before this court based on diversity jurisdiction, the *Erie* doctrine instructs that federal courts must apply state substantive law and federal procedural law. Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1163 (10th Cir. 2017). As the Lease contains no choice-of-law provision, it must be interpreted according to the law and usage of the place where it is to be performed. 15 Okla. Stat. ("O.S.") § 162. Oklahoma law requires that contracts be interpreted "as a whole so as 'to give effect to the mutual intention of the parties, as it existed at the

time of contracting.'" Dillon Family & Youth Servs., Inc. v. Dep't of Human Servs. ("Dillon"), 965 F.3d 932, 933-34 (10th Cir. 1992) (*quoting* 15 O.S. § 152). The language in a contract is given its plain and ordinary meaning unless some technical term is used in a manner meant to convey a specific technical concept. 15 O.S. § 160. Where "the language of the contract is clear and unambiguous," the court "derive[s] the intent of the parties from the plain language of the contract." Dillon, 965 F.3d at 933-34 (*citing* 15 O.S. §§ 153, 154). If the contract is ambiguous, the language therein should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party. 15 O.S. § 170.

### A.  STAPLES INC. IS NOT A PROPER PARTY

It is undisputed that defendant Staples Inc. has not been a party to the Lease since execution of the third amendment, dated January 15, 2019, which expressly "release[d] and fully and forever discharge[d]" Staples Inc. "from any and all claims, causes of action, covenants, demands, obligations and liabilities arising from and under the Lease." [Doc. 38 at 1 & n.1 (*quoting* Doc. 36-10 at 2, § 6); Doc. 40 at 3, ¶ 9]. As there is no genuine dispute regarding this material fact, the court finds Staples Inc. was not a party to the Lease at the time the issues herein arose. Therefore, as a matter of law, Staples Inc. is entitled to summary judgment on Landlord's remaining claims for breach of contract and waste. *See* Fed. R. Civ. P. 56(a).

### B.  COUNT I | BREACH OF CONTRACT

Landlord's breach of contract theory is premised on its interpretation of Sections 7.2.2 and 10.1 of the Lease as collectively imposing an affirmative duty on

10

Tenant to file a claim for insurance proceeds in the wake of the March 2024 hailstorm. While conceding that it alone was obligated to perform repairs or replacements pursuant to Section 10.1, Landlord contends that merely maintaining the Policy required under Section 7.2.2 was insufficient; rather, Tenant was obligated to file a claim and tender the resulting proceeds to enable Landlord's performance of its restoration duties. [Doc. 35 at 6; Doc. 40 at 7-8]. Landlord further asserts that Tenant *could have* sheltered from liability under Section 7.3.2 for the roof replacement costs ($116,250), including the Policy's deductible ($250,000), *if* Tenant had fulfilled its purported obligation to file a claim for insurance proceeds. [Doc. 35 at 6-7; Doc. 40 at 8]. Thus, Landlord's position is that Tenant's express duty to maintain the Policy includes a subordinate duty to fund restoration by requesting and remitting proceeds.

Tenant, in contrast, argues that the parties could not have intended it to be liable to Landlord for the amount of the Policy's deductible because: Landlord released Tenant from liability to the extent of insurance coverage, including any deductible [Doc. 36 at 15 (*citing* Doc. 36-1 at 17 (§ 7.3.2))]; Landlord, not Tenant, is required to restore the Premises after casualty at Landlord's expense [*Id.* (*citing* Doc. 36-1 at 18-19, 21 (§§ 8.2, 10.1))]; and Landlord never requested a Lease amendment providing that Tenant will be liable for the amount of the Policy's deductible [*Id.*]. The court agrees with Tenant and finds several interpretative shortcomings in Landlord's construction of the Lease.

### 1.    No Express or Implied Duty to File an Insurance Claim

Without citing any supporting language in the Lease, Landlord alleges that the hailstorm constituted a "condition precedent" under Section 10.1, thereby

11

triggering a duty on Tenant's part to file an insurance claim irrespective of its Policy's deductible. [Doc. 35 at 6; Doc. 40 at 7-8]. The Lease provisions governing the parties' property insurance obligations—Sections 7.2.2, 7.3.1, and 7.3.2—do not support Landlord's position.

Section 7.2.2 states only that "Tenant shall, at its sole cost and expense, maintain 'all-risk' property insurance covering the Premises ... on a 100% replacement cost basis." [Doc. 36-1 at 16]. This language unambiguously imposes a maintenance obligation upon Tenant and does not include any requirement that Tenant file claims or manage the administration of insurance proceeds. Section 7.3.1, in turn, provides that "all property insurance proceeds shall be paid to Landlord" and "used for restoration" under Article X of the Lease. [*Id*. at 16-17]. While this clause contemplates that any proceeds from casualty-related claims must be delivered to Landlord and used for restoration, it does not mandate that Tenant initiate the claim process or otherwise act as a conduit for insurance administration. Section 7.3.1 thus governs the disposition of proceeds once they exist, as opposed to the triggering or pursuit of those proceeds. Lastly, Section 7.3.2 establishes a mutual waiver for property damage covered (or required to be covered) by insurance. Both parties agreed to release one another from liability for insured losses under this provision, including those subject to a deductible or self-insured retention. By its terms, Section 7.3.2 prevents either party from seeking reimbursement from the other where the loss is insurable under the Lease, even if no insurance payment is actually made.

These pertinent Lease provisions omit any mandatory language—such as "Tenant shall file," "must pursue," or "is obligated to remit proceeds"—that would support Landlord's theory of liability. In the absence of such language, Landlord's attempt to convert Tenant's express obligation to maintain all-risk insurance under Section 7.2.2 into an implied duty to fund Landlord's restoration obligation under Section 10.1 lacks textual support. Courts generally decline to infer additional obligations into sophisticated, arm's-length commercial agreements. *See e.g.,* Krug v. Helmerich & Payne, Inc., 2013 OK 104, ¶ 35, 320 P.3d 1012, 1022. This is particularly true where, as here, those negotiations are between repeat players and involve standardized forms used across multiple transactions. Under Oklahoma law and general contract principles, implied covenants are disfavored when the contract's language is clear and unambiguous and where the parties could have, but did not, express the obligation at issue. *See* Mercury Inv. Co. v. F.W. Woolworth Co., 1985 OK 38, ¶ 12, 706 P.2d 523, 530.

### 2.   **Restoration is Landlord's Duty and Risk**

Section 10.1 of the Lease expressly provides that "Landlord *shall at its expense* restore the Premises (including tenant improvements that are insured pursuant to Section 7.2 but excluding Tenant's trade fixtures, inventory, and other personal property) to substantially their condition prior to such casualty." [Doc. 36-1 at 21 (emphasis added)]. This allocation of restoration obligations between the parties reflects a typical commercial leasing structure in which Landlord assumes responsibility for the building envelope and structural components of the Premises

13

while Tenant bears the risk of loss to movable or business-specific items. Such language squarely places the duty of performance and the financial burden of restoration on Landlord, and Section 10.1 contains no language conditioning that duty on Tenant's cooperation, insurance proceeds, or administrative participation.

While Section 10.1 does reference insurance proceeds as relevant to timing—that is, restoration must commence within 60 days after Landlord receives insurance proceeds and must be completed within 180 days of that same date—it does not state or imply that restoration is conditioned on the availability of such proceeds. Landlord's restoration obligation is consequently time-sensitive rather than funding-contingent. Had the parties intended Tenant to bear responsibility for funding restoration, they could have easily included standard commercial lease provisions requiring Tenant to name Landlord as a loss payee, requiring joint insurance administration, or including an express claim and disbursement mechanism. Their failure to include any of these standard provisions in the Lease (or by way of amendment) suggests such a duty was neither intended nor reasonably implied. *See* 15 O.S. §§ 152, 154, 160; *see also* Krug, ¶ 35, 320 P.3d at 1022.

### 3. Absence of Bad Faith Allegation

Section 10.1 also includes a limited exception in the event Landlord's delay in receiving insurance proceeds is "solely due to Tenant's bad faith in obtaining the same." [Doc. 36-1 at 21]. This language acknowledges that insurance proceeds *might not be received* and imposes consequences *only* when Tenant acts in bad faith. By explicitly carving out bad faith as the sole basis for excusing Landlord's untimely

restoration, the Lease necessarily implies that any other cause—such as inaction, mistake, or a differing interpretation of the Lease—does not excuse Landlord's performance and does not constitute breach by Tenant. In short: if bad faith is the floor for liability, then good-faith inaction is not a breach under the Lease.

In its attempt to base a breach of contract claim on the very conduct that the Lease treats as actionable only if done in bad faith, Landlord flips the contractual structure on its head. Although Section 10.1 plainly provides nonperformance is not actionable unless it involves bad faith, Landlord contends Tenant's nonperformance is actionable even in the absence of bad faith. Allowing Landlord to prevail on a breach theory without alleging bad faith would render Section 10.1's limitation meaningless, in violation of basic principles of contract construction. Moreover, as Landlord claims to have completed restoration of the roof within the 270-day deadline prescribed by Section 10.1, no actual prejudice to performance of its restoration obligation occurred.

Even assuming *arguendo* that Landlord had alleged bad faith, the summary judgment record does not support such a finding. As established, the Policy maintained by Tenant carried a $250,000 deductible per casualty event. The cost to replace the Premises roof ($116,250) fell well below that amount. As Tenant correctly notes, "there was no insurance coverage or need to file an insurance claim because there would be no insurance proceeds payable until after the deductible amount was met." [Doc. 38 at 8; *see also* Doc. 36 at 18]. Indeed, no proceeds would have been available to fund restoration even if Tenant had acted exactly as Landlord claims was

required. *See* Newman v. Roach, 1925 OK 714, ¶ 19, 239 P. 640, 643 ("It is a general rule that, where it is manifest that a demand [for performance] would have been wholly futile if made, it is unnecessary to go through the formality of making it."). The record therefore establishes that Tenant's omission caused no harm. Under Oklahoma law, a breach of contract claim fails absent proof of damages directly caused by the alleged breach. Digital Design Grp., Inc. v. Info. Builders, Inc., 2001 OK 21, ¶ 33, 24 P.3d 834, 843. The court finds that Tenant is entitled to summary judgment on Landlord's remaining breach of contract claim, and that Landlord is consequently not entitled to summary judgment on the same.

### C.   COUNT III | DOCTRINE OF WASTE

Landlord claims that Tenant violated the doctrine of waste by "fail[ing] to perform under the Lease" and thereby "caus[ing] unreasonable injury" in that Tenant's "failure to work towards replacing the roof" caused the Premises "to decrease in value." [Doc. 2-4, ¶ 52]. Generally, the doctrine of waste prevents the possessor of real property from causing "unreasonable injury" to the interest held by others in that property. McGinnity v. Kirk, 2015 OK 73, ¶ 9, 362 P.3d 186, 190; *Waste*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining waste as "[p]ermanent harm to real property committed by a tenant (for life or for years) to the prejudice of the heir, the reversioner, or the remainderman.").

Landlord's allegations ignore the plain language of the Lease, which places the duty on Landlord to maintain, repair and restore the roof at its expense. *See* [Doc. 36-1 at 18-19 (§ 8.2), 21 (§ 10.1)]. The Lease further provides that "Tenant shall not be

required to make any repairs or replacement required to be made by Landlord pursuant to Section 8.2 … or Article X[.]" [*Id.* at 18 (§ 8.1)]. Moreover, the record shows that Tenant repeatedly urged Landlord to make repairs and replace the Premises roof in order to quell continual disruptions to the operation of Tenant's business caused by water infiltration [Doc. 36-26; Doc. 36-29; Doc. 36-31; Doc. 36-33; Doc. 36-36], and that Tenant incurred approximately $15,360.45 in out-of-pocket remediation expenses for roof-related repairs from October 2023 to October 2024 [Doc. 36-13; Doc. 36-14; Doc. 36-15; Doc. 36-16; Doc. 36-17; Doc. 36-18; Doc. 36-19; Doc. 36-20; Doc. 36-21].

Notwithstanding, Landlord's response in opposition to summary judgment fails to address any of the arguments challenging its third cause of action. As the nonmovant, Landlord bears the burden under Fed. R. Civ. P. 56(e) to identify specific facts showing a genuine issue for trial. Otherwise, the nonmovant acts, or fails to act, at its peril. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998). The conclusory allegations set forth in Landlord's state court petition, although verified, are insufficient to satisfy this burden. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (*quoting* Anderson, 477 U.S. at 250) ("The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."). Because the Lease does not identify "waste" as a contractually specified basis for breach, and because Tenant is otherwise entitled to summary judgment on Landlord's remaining breach of contract claim, the court concludes that

summary judgment must likewise be entered in Tenant's favor on the standalone waste claim.

## V. CONCLUSION

IT IS THEREFORE ORDERED that the motion for partial summary judgment [Doc. 35] filed on behalf of plaintiff Ada Real Estate Joint Venture, Ltd. is hereby **DENIED**.

IT IS FURTHER ORDERED that the motion for summary judgment [Doc. 36] filed on behalf of defendants Staples the Office Superstore East, Inc. and Staples Inc. is hereby **GRANTED**.

IT IS FURTHER ORDERED that defendant Staples Inc. is hereby **DISMISSED** with prejudice, as it ceased to be a party to the Lease on January 19, 2015 and cannot be held liable for any breach occurring thereafter.

IT IS SO ORDERED on this 9th day of July, 2025.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE